Philip R. Fendall, U. S. Atty.

---

LUCE, Ex parte. See Case No. 1,099.

---

## Case No. 8,589.

### LUCE v. SPRINGFIELD FIRE & MARINE INS. CO.

[1 Flip. 281;[1] 2 Ins. Law J. 443; 5 Chi. Leg. News, 303; 19 Myers' Fed. Dec. 636.]

Circuit Court, W. D. Michigan. March, 1873.

INSURANCE POLICY—COMPROMISE—VALUED POLICY.

1. A compromise agreement to constitute a good defense to a suit upon any insurance policy, must be binding upon both parties, and of such a character as to operate as a satisfaction of the contract of insurance.

[Cited in Fisher v. Crescent Ins. Co., 33 Fed. 552.]

2. A policy enumerating certain articles with figures indicating dollars placed opposite to each, does not constitute a valued policy.

[Action by Benjamin Luce against the Springfield Fire & Marine Insurance Company.]

O. E. Corbitt and L. D. Norris, for plaintiff.

Hughes, O'Brien & Smiley, for defendant.

WITHEY, District Judge. Luce brings this action as the assignee of a policy of insurance, issued by the defendant to James H. Roberts, dated February 28, 1871, insuring Roberts "against loss or damage by fire to the amount of $2,500, for one year, on his oil paintings, consisting of landscapes and portraits, as per schedule, $7,500 other insurance." In the printed portion of this policy is this clause: "Said loss or damage to be estimated according to the true and actual cash value of the said property at the time the same may happen."

The schedule referred to in the policy was made up and furnished by the insured to defendant's agents some two or three days after the application for insurance, and subsequent to the date of the policy, enumerating one hundred and five paintings; opposite each is extended in figures what purports to be Roberts' estimate of value. I say Roberts' estimate, because it is in proof that the figures indicate his valuation. The schedule reads:

"President Taylor and Cabinet, $1,000; President Harrison and Cabinet, $1,000; one full-length portrait of Washington, $1,000; General Taylor and the Battle of Buena Vista, $3,000," etc., comprising one hundred and five paintings, the aggregate of the sums extended amounting to $45,900. Three questions are presented: 1st—Was there a compromise between Roberts, plaintiff's assignee,

and defendant and the other companies that issued policies insuring the property? 2d—Was the policy issued by defendant a valued policy? 3d—What is the measure of damages?

Four companies issued policies covering the property in question, three of them insuring $2,500 each, and one $2,400, making $9,900 insurance. Defendant's policy was for $2,500; the Phoenix, of Hartford, $2,500; the Home, of New York, $2,500, and the Queen, of Liverpool and London, $2,400. Mr. Ireton, the general agent and adjuster of the Phoenix, visited Grand Rapids, and under claim that he represented, for purposes of settlement, all the companies, obtained an understanding with the insured that the companies would pay pro rata, and the insured would accept $3,000 in full satisfaction of the four policies. All the paintings, save two, having been destroyed by fire, Roberts claimed $9,900 full insurance. Ireton claimed the paintings were worthless as works of art, and of trifling value. The evidence shows that Ireton had no authority to bind all the companies, consequently his promise that any company for which he was not authorized to act would give Roberts a draft for its proportion, was not binding on such company. From which it follows that as to all the policies there was no binding compromise.

By the terms of the arrangement, Roberts was to receive drafts from the companies as soon as they could arrive from Detroit, where defendant and the Queen were represented by general agent and adjuster. The two drafts from Detroit were received within two or three days by the local agents at Grand Rapids, who offered them to Roberts if he would receipt and surrender the policies of those companies. A few days after this Roberts transferred to plaintiff, Luce, all the policies remaining in his hands, and his rights in the surrendered Phoenix policy. No draft in behalf of the Home Company was received by the local agents, nor was one drawn or tendered to Roberts in behalf of the Home until the trial of this cause.

Mr. Ireton, at the time of the arrangement of compromise, gave Roberts a draft for $757.58 on the Phoenix Company, being its proportion of the $3,000 to be paid in compromise, and took up the policy of that company. The tender by defendant and the Queen was conditioned that Roberts surrender and receipt the policies. It would seem that such incomplete tender by two companies, and no seasonable tender by the Home, would present another good reason why the compromise was not effected, if a tender and readiness to perform were necessary. But standing as a mere agreement of compromise, it must have been one which would operate as a satisfaction of the contracts of insurance before such agreement can be offered as a defense to an action on the policies. A compromise agreement like accord and satisfaction, in order to take away the

---

[1] [Reported by William Searcy Flippin, Esq., and here reprinted by permission.]

right of action on the original contract, must be an agreement which is substituted for the pre-existing obligation. It must bind both parties so that suit may be maintained by either, to enforce the same. I think neither party was bound by the compromise arrangement, except so far as it was executed, as it undoubtedly was, with the Phoenix Company.

The question of valued policy is not so free from difficulty. This policy runs very close to the dividing line between an open and a valued policy, but after much consideration it is my opinion that this is not a valued policy. Such a policy determines beforehand, the amount for which the insurer is liable in case of loss, and is inserted in the policy as a fixed sum, to be paid if loss occurs. It does more than merely value the property insured, it values the loss. To do this the policy must amount to a contract, either to pay, in case of loss, a stipulated sum; or that the property shall be estimated at a stipulated sum in case of loss. Such seems fairly stated, to be the rule of the books. Fland. Ins. 45; Phillips, Ins. § 1178, 1180, 1213; Harris v. Eagle Fire Ins. Co., 5 Johns. 368; Laurent v. Chatham Fire Ins. Co., 1 Hall, 52, 53; Wallace v. Insurance Co., 1 Benn. Fire Ins. Cas. 412.

An agreement between the insurer and insured that the property shall be estimated at a certain sum, would make a valued policy, and the question is, was that done in this case? It has been held, when the policy describes the property, and contains a clause "valued at," or "agreed value," or "worth," followed by a specific sum, that such words indicate a valued policy, because amounting to an agreement that in case of loss, the property shall be estimated of the value stated.

If the policy, after describing the property, had added only "value $10,000" or other sum, this might probably, by analogy with decided cases, be held a valued policy; and yet, it would then seem not to be within the idea of a valued policy as defined in the books, but to value the property, not the loss; between valuing the property and valuing the loss, the books have attempted to make distinction, and yet it verges upon a distinction without a difference, when we consider the cases cited to illustrate and support the rule; and yet, in principle, there is a clear distinction, though not always exemplified by the adjudicated cases. The tendency of the cases is to hold that valuing the property values the loss, and is in the right direction.

But does this policy indicate such an agreement between the parties? I read this policy as if, instead of the words "as per schedule," it ran thus: "Do insure James H. Roberts against loss or damage by fire, to the amount of $2,500, for one year, on his oil paintings, consisting of landscapes and portraits, viz: President Taylor and Cabinet, $1,000; President Harrison and Cabinet, $1,000; one full length portrait of Washington, $1,000; General Taylor and the Battle of Buena Vista, $3,000," and so on, with the entire list of 105 paintings.

Now unless the court interpolates into this contract some word or words, not there, before the sign of dollars, in each instance, indicating that the figures represent agreed values, as "worth," "valued at," "value," or "agreed value," it is not clearly seen how the policy can be held, according to adjudicated cases, or upon principle, to be an agreement that in case of loss, such amounts shall be the estimated value of the paintings named. Especially is it difficult to so read the contract, when further on, in the printed portion of the policy, is the express stipulation that "the loss or damage is to be estimated according to the true and actual cash value of the property at the time the same may happen."

If the written part of the policy is inconsistent with the printed portion, the latter must give way to the former. This is a well established rule in reference to policies of insurance, but I am unable to say that there is any inconsistency, and certainly the rule is as well settled that the different classes must be made to harmonize if possible. They are not inconsistent, but in harmony, when read together. Without further discussion, I hold, for the reasons stated, that this is not a valued policy.

The only question remaining is, as to the rule of damage. The plaintiff's only testimony on this subject is that given by Roberts, the insured, who says in his judgment, the paintings were worth forty-five thousand dollars. Roberts is an old man, and has for thirty years been engaged in painting; but when his testimony is weighed in the light of the evidence produced by the defendant, no one can justly conclude otherwise than that Roberts' judgment is not a safe criterion of the value of these paintings. The basis of his judgment was not stated, and I have little doubt no just basis for his extravagant valuation exists.

On the part of the defendant there were four persons testified, all of whom speak from knowledge of works of art, including paintings. One, for thirty years has been a successful portrait painter; two have been and are extensive dealers in paintings and works of art, importing from Europe, and evincing a discriminating judgment of art works. They all testify that as works of art, these paintings had no value. Their judgment was based upon, and they testified in reference to, the two paintings which were not destroyed. Portraits of "John Wesley," and "Governor Bouck," which were by Roberts; the insured declared to be of average merit with the paintings destroyed, as I have the testimony, though it is claimed he qualified this statement as to "Wesley." But take "Governor Bouck" as a standard. The witnesses say these two paintings, which were produced in court, are worthless as works of art. Both paintings were thus characterized; that of "Wesley"

utterly worthless, and that of "Governor Bouck" as very inferior; it has "hardness of color or surface texture, wanting in drawing, wholly defective in composition, coloring and everything. They do not come under the head of art."

It is said by these witnesses, that landscape paintings of like inferior quality, would be worth more than portraits, because they would sell better at auction to persons without taste, or ignorant of art or of the value of paintings. They say landscapes of like want of merit might bring twenty-five to fifty dollars at auction. Portraits of "Governor Bouck" might bring twenty-five to thirty dollars, for the sake of having a copy of Elliott's original painting, but such portraits as "John Wesley," would be utterly worthless. Paintings find their market value mainly from their quality and the name of the artist. There are in this list of paintings eighty-eight portraits, four groups of portraits, five battle pieces, four historical pieces, and four landscapes. Under the evidence, it is somewhat doubtful what the value of the destroyed paintings may be, but the proofs will justify me in finding about $3,000 as the value, particularly if aided by the fact that the defendant, with the "Home" and "Queen" come into court and tender at this rate; while in my opinion $3,000 is the full value of the paintings in any and every aspect of the case; and I am not disposed, in view of all the facts, to fix the amount less.

Defendant is liable for $757.58 of this value, and $44.20 for nine months' interest. Judgment for plaintiff $801.78, and costs.